IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,              )
                                       )
                v.                     )        Criminal No.  3:14MJ245 (DJN)
                                       )
MICHAEL W. CROSS,                      )
                Defendant.             )
_____)

## MEMORANDUM OPINION

Defendant Michael Cross seeks suppression of evidence obtained by police as a result of Defendant's interaction with a Department of the Army security guard at the entrance to the Fort Lee military installation.  Specifically, Defendant seeks to suppress identity-related statements that he made during the interaction with the security guard, including his name and date of birth, as well as information obtained as a result of those statements regarding the suspension of Defendant's driving privileges.  Defendant also seeks to suppress the security guard's observations during and after the interaction.  For the reasons that follow, the Court DENIES Defendant's Motion to Suppress (ECF No. 6), because Defendant's encounter with the security guard failed to offend the Fourth Amendment.

### I.      FACTUAL BACKGROUND

On September 12, 2014, the Court conducted an evidentiary hearing on Defendant's motion.  During the hearing, Department of the Army Security Guard Anthony Spokas ("DASG Spokas") testified regarding the events that preceded Defendant's arrest for driving with a suspended license.  Defendant called no witnesses and relied solely on his counsel's cross-examination of DASG Spokas.  After viewing DASG Spokas's testimony and considering the

evidence admitted during the hearing, the Court found DASG Spokas credible.[1] DASG Spokas's testimony established the following facts.

On the afternoon of June 30, 2014, DASG Spokas was on duty and assigned to the Temple Avenue Gate ("Temple Gate") entrance to Fort Lee. (Suppression Hr'g Tr. ("Tr.") at 5-6.) Fort Lee serves as a United States Army post administered by the Department of Defense and falls within the special territorial jurisdiction of the United States and this Court. (Tr. at 4.) Temple Gate stands on Edgewood Road, near the intersection of Edgewood Road and Temple Avenue. (Tr. at 21-22.) Edgewood Road falls within the jurisdictional parameters of Fort Lee. (Tr. at 22.) Between 4:10 a.m. and 2:00 p.m. each day, the metal gate fence on Edgewood Road remains open to allow access to Fort Lee via the Temple Gate. (Tr. at 39.) A metal fence and a series of pylons separate the two lanes of traffic on Edgewood Road, while two larger brick structures — one on each side of Edgewood Road that say "Fort Lee" on them — anchor a metal gate that spans the road when closed. (Tr. at 38.)[2] A sign at the Temple Avenue-Edgewood Road intersection states that persons seeking entry to Fort Lee must present identification, but no sign on Edgewood Road indicates that parking is prohibited. (Tr. at 14, 37.)

DASG Spokas serves as a civilian security guard employed by the Department of the Army. (Tr. at 4.) While on duty, DASG Spokas wears a uniform beneath a yellow reflective vest that covers his torso. (Tr. at 23, 39.) He carries a service weapon that he wears outside of his clothing. (Tr. at 23.) DASG Spokas's duties include "enforcing the security regulations of

---

[1]     Though the Court found DASG Spokas's testimony credible, certain aspects of his testimony were internally inconsistent. Where the record reflects that DASG Spokas gave conflicting testimony, the Court will construe DASG Spokas's statement in the light most favorable to Defendant.

[2]     Both parties submitted photographs of the gate area at the Temple Avenue-Edgewood Road intersection, which the Court admitted into evidence. *See* Government's Exhibits 1-3; Defense Exhibits 1-5.

the installation[,] allow[ing] access to pedestrians and vehicles through the use of identification cards, vehicle decals, and verbal questioning." (Tr. at 4.) DASG Spokas lacks the authority to issue citations for traffic violations, but under DASG standard operating procedures, he does possess the authority to direct traffic. (Tr. at 13, 18.)

While standing guard at the security guard hut located just inside the Temple Gate on June 30, 2014, DASG Spokas saw Defendant's car, a gold-colored Ford Taurus, "pull up right outside of [Temple] Gate" at approximately 1:00 p.m. (Tr. at 8-9, 30.) Defendant's car stopped as though it was parked "[r]ight outside of the fence line" on Edgewood Road, approximately 100 feet away from where DASG Spokas stood. (Tr. at 9, 11.) The car "wasn't far from the road, maybe a foot or two off the asphalt in either direction." (Tr. at 20.) From where he stood, DASG Spokas could not see cars beyond the brick structures very well. (Tr. at 14.) He could see the front of Defendant's car and observed Defendant inside, but he could not see what Defendant was doing or whether any passengers were in the car. (Tr. at 11, 30.) The car remained there on the grass shoulder, motionless, facing the hut at an angle. (Tr. at 11.)

Before reaching the Gate fence, drivers pass a sign visible from Temple Avenue informing them of the Fort Lee entry requirements, which include presenting identification. (Tr. at 37.) People who lack identification or who do not wish to enter Fort Lee rarely idle at the fence line. (Tr. at 37.) Though there are no signs on Edgewood Road prohibiting parking, DASG Spokas explained that people normally did not stop or park their cars there, because it was so close to the "busy intersection" with Temple Avenue. (Tr. at 13-14, 37.) As a result of where Defendant parked his vehicle, Defendant had no choice but to pull forward towards the guard hut checkpoint, because "in that section of the roadway where the traffic light is, there's like a ravine in the road. There's no way to back up into it without disabling the vehicle,

3

basically." (Tr. at 20.) DASG Spokas testified that although Defendant's car was on the

shoulder, the car nevertheless obstructed traffic by blocking the line of sight of drivers turning

from Temple Avenue onto Edgewood Road and forcing other drivers "to take extra precaution[s]

to get around the vehicle to see where they were headed." (Tr. at 14.)

 DASG Spokas received regular training for his job, including training in identifying and

addressing suspicious vehicles on Fort Lee property. (Tr. at 11.) As part of this training, DASG

Spokas learned that "[a]ny vehicle parked outside of the front of the Gate is considered

suspicious," because it could pose a security threat to the installation. (Tr. at 11-12.) The

concern, DASG Spokas explained, is that "[a]nybody could sit there and watch the gates of a

military installation. . . . People could spy on the gate to watch how the entry regulations go[,]

could find out how to enter the installation. Just anytime they watch us, security operations, it's

considered unsafe." (Tr. at 12-13.) DASGs are trained to respond to a suspicious vehicle in one

of two ways, depending on the DASG's proximity to the vehicle. (Tr. at 11-12.) When close

enough to communicate with the vehicle without leaving his post, the DASG should attempt to

resolve the situation himself. (Tr. at 11.) If, however, the vehicle is too far away for the DASG

to address, or if the vehicle's driver does not acknowledge the DASG, then the DASG is trained

to call the military police office to report the situation. (Tr. at 12.) Upon receiving such a call,

the military police will respond to the scene and investigate. (Tr. at 12.)

 Based on his training and the location of Defendant's car just outside of Temple Gate,

DASG Spokas determined that Defendant's car was suspicious. (Tr. at 11-12.) DASG Spokas

testified that he based his conclusion on the unusual positioning of Defendant's car, not on any

observations about the behavior of its occupants or the car's physical condition or contents. (Tr.

at 11, 33-36.) Because Defendant's car was only 100 feet away, DASG Spokas decided that

4

Defendant's car was close enough that he could attempt to resolve the situation himself without contacting the military police. (Tr. at 12.) Unable to leave his post, DASG Spokas "waited a few moments, maybe 30 seconds, and . . . began to wave at [Defendant's] vehicle." (Tr. at 14-15.) Defendant did not acknowledge him, so DASG Spokas "waited a few more seconds, maybe 10 or 15 seconds, and waved again." (Tr. at 15.) Defendant did not make any gestures in response to DASG Spokas's waves. (Tr. at 16.) DASG Spokas "motioned for [Defendant] to come forward" with his right hand, which he did. (Tr. at 15, 35.) At no point did DASG Spokas show his badge or draw his service weapon to compel Defendant's compliance. (Tr. at 16.)

DASG Spokas explained his motivation for trying to get Defendant's attention, stating that "sometimes it's possible for an individual to have, like, a broken down car . . . or [to] be using their cell phone because cell phones are not authorized on post." (Tr. at 15.) "If it was something simple like that," DASG Spokas elaborated, "I would wave them in to see what was going on, to see what they were doing out there, and that's why I tried to handle it myself. It is one of my duties to find out exactly what's going on. If I can resolve the situation myself, I do so." (Tr. at 15.)

When Defendant pulled forward to where DASG Spokas stood, DASG Spokas "asked him where he was headed that day." (Tr. at 16.) Defendant responded that he was picking up someone from work. (Tr. at 16.) At that point, pursuant to his duty to verify the identity of everyone who approaches the Temple Gate entrance to Fort Lee, DASG Spokas asked Defendant for his identification. (Tr. at 16-17.) DASG Spokas testified that this was standard operating procedure. (Tr. at 23.) Every time someone pulls up to the Gate, DASG Spokas asks them for identification and then scans the individual's identification card through "a handheld Rapid Gate System." (Tr. at 23.) In addition to the information displayed on the card itself, the scanner

5

notifies the DASG whether the identification card is valid and whether the person has been barred from the installation. (Tr. at 24.) If the person does not have identification to present, however, DASG Spokas is required to "get their name and date of birth, and then call the [military] police office and give them the information." (Tr. at 17.) These mandatory procedures are required regardless of whether the person approaches the Gate intentionally or inadvertently, because even those who do not wish to enter the installation must go through the checkpoint to execute a legal U-turn and exit along Edgewood Road towards Temple Avenue. (Tr. at 19.)

Defendant responded to DASG Spokas's request for identification by telling him that he did not have proof of identity to provide. (Tr. at 17.) DASG Spokas then asked Defendant for his name and date of birth, and then radioed that information to the Fort Lee military police office. (Tr. at 17.) At no point during the encounter with DASG Spokas did Defendant inform DASG Spokas whether Defendant did, or did not, want to enter the installation, nor did Defendant indicate that he wanted to terminate the encounter and depart. (Tr. at 36, 19.) The military police determined that Defendant had a suspended license and dispatched an officer to the Gate to issue a traffic citation to Defendant.[3] (Tr. at 17.) Once the police officer arrived on scene, DASG Spokas had no further interaction with Defendant. (Tr. at 19.)

The military police officer cited Defendant for driving on a suspended license in violation of 18 U.S.C. § 13 (assimilating Va. Code § 46.2-301), his third such offense within 10 years. (Govt.'s Resp. to Mot. to Suppress Evidence (ECF No. 7) ("Govt.'s Resp.") at 2.) Defendant

---

[3]     Officer Spokas did not testify as to how the military police determined that Defendant had a suspended license, but the parties do not dispute that the military police ran Defendant's name and date of birth through the Virginia Criminal Information Network ("VCIN"). This VCIN search identified Defendant's license as suspended. (Govt.'s Resp. to Mot. to Suppress Evidence (ECF No. 7) at 2; Def.'s Supplemental Mem. in Supp. of Mot. to Suppress Evidence (ECF No. 11) at 1-3.)

moves to suppress all evidence obtained both during and as a result of his interaction with DASG Spokas on the basis that DASG Spokas illegally seized Defendant in violation of the Fourth Amendment. Specifically, Defendant seeks to suppress his statements, including his name and date of birth, as well as records obtained as a result of those statements, including Defendant's driving record and VCIN information. Defendant further seeks suppression of DASG Spokas's observations after the alleged seizure. (Def.'s Supplemental Mem. in Supp. of Mot. to Suppress Evidence ("Def.'s Supplemental Mem.") (ECF No. 11) at 1.)

## II. DISCUSSION

Defendant's motion raises three issues. First, the Court must determine whether DASG Spokas's encounter with Defendant began as a seizure or as a mere consensual encounter. Defendant asserts that DASG Spokas seized Defendant by waving him forward towards the checkpoint. (Def.'s Mot. to Suppress Evidence ("Def.'s Mot. to Suppress") (ECF No. 6) at 1-3.) The Government contends that DASG Spokas did not seize Defendant by waving at him. (Govt.'s Resp. at 2.) Because Defendant voluntarily approached the Gate and engaged with DASG Spokas, the Court finds that the interaction between them began as a consensual encounter that did not implicate the Fourth Amendment.

Second, the Court must determine whether this encounter remained consensual until its conclusion or ripened into a seizure requiring reasonable suspicion or probable cause. Defendant argues that even if DASG Spokas possessed adequate justification to determine why Defendant was parked on the shoulder, DASG Spokas exceeded the reasonable scope and duration of the stop by requesting Defendant's identification. (Def.'s Reply to Govt.'s Resp. ("Def.'s Reply") (ECF No. 9) at 5-7.) The Government counters that if DASG Spokas did seize Defendant, the seizure was reasonable and justified under the totality of the circumstances. (Govt.'s Resp. at 3.)

7

As to this issue, the Court finds that, although Defendant was briefly seized at the Gate checkpoint, the stop was objectively justified and the nature of the encounter remained consensual until the point at which a police officer was dispatched to the Gate to issue Defendant a citation.  When the records search returned information regarding Defendant's driving status, DASG Spokas had probable cause to seize Defendant by prolonging the stop until the police officer arrived.

Third, assuming, *arguendo*, that at some point during this situation Defendant was unconstitutionally seized, the Court must then determine whether that illegality necessitates suppression of identity-related information provided by Defendant, namely his name and date of birth, as well as information obtained from those statements pertaining to the suspension of Defendant's driving privileges.  However, because the Court finds no constitutional violation as to the previous issues, it need not reach this question.

A.  General Fourth Amendment Seizure Principles

The Fourth Amendment guarantees the right of the people to "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. "The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976)) (internal quotation marks omitted).  The Supreme Court "has long held that the touchstone of the Fourth Amendment is reasonableness." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)) (internal quotation marks omitted).  Courts assess the reasonableness of law enforcement conduct objectively through a fact-specific inquiry informed

8

by the totality of the surrounding circumstances. *Id.* at 39.

Clearly, not all encounters between citizens and law enforcement constitute seizures within the contemplation of the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). The Supreme Court distinguishes between three categories of police of citizen-police interactions. *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002). "Each category represents differing degrees of restraint and, accordingly, requires differing levels of justification." *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 460 (4th Cir. 2013) (citing *Weaver*, 282 F.3d at 309).

At one end of the spectrum are arrests, which require probable cause. *Weaver*, 282 F.3d at 309 (citing *Brown v. Illinois*, 422 U.S. 590 (1975)). At the other end are consensual encounters — brief interactions between citizens and law enforcement that require no justification, are not seizures and do not implicate Fourth Amendment protections. *Santos*, 725 F.3d at 460 (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)); *Weaver*, 282 F.3d at 309. Between these extremes fall brief investigatory stops, often called "'*Terry* stops[,]' [which] require reasonable, articulable suspicion of criminal activity." *Santos*, at 460 (citing *Terry*, 392 U.S. at 21).

In *United States v. Mendenhall*, the Supreme Court articulated the standard against which courts evaluate the nature of a police-citizen encounter: "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S. at 554; *see also United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989) (discussing application of the *Mendenhall* analysis in this Circuit). Short of this degree of restraint, however, no "foundation . . . for invoking constitutional safeguards" exists. *Mendenhall*, 446 U.S. at 553.

Courts applying *Mendenhall*'s totality of the circumstances test consider a number of factors to determine whether a particular encounter constituted a seizure, but typically focus on three main areas: the conduct of the police, the characteristics of the defendant and the physical surroundings of the encounter. *Gray*, 883 F.2d at 322 (citing *United States v. Black*, 675 F.2d 129, 124 (7th Cir. 1982)). Where the factual scenario renders the "free to leave" approach unsuitable, such as when the individual's "freedom of movement was restricted by a factor independent of police conduct[,] the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436 (discussing application of this alternative formulation of the standard in *I.N.S. v. Delgado*, 466 U.S. 210 (1984)); *see also United States v. Burton*, 228 F.3d 524, 529 (4th Cir. 2000) (citing *Illinois v. Wardlow*, 528 U.S. 673 (2000)) (discussing principle that defendant had a "right to go about his business or to stay put and remain silent"). Mindful of these foundational principles, the Court turns to the matter at hand.

    B. DASG Spokas Did Not Seize Defendant By Waving At Him

       The Court first must determine the nature of Defendant's interaction with DASG Spokas. Defendant argues that under the totality of the circumstances, DASG Spokas seized Defendant by waving him forward, because a reasonable person would have felt compelled to submit to DASG Spokas's direction. (Def.'s Mot. to Suppress at 1-3.) The Government responds that no reasonable person would have felt compelled to approach the checkpoint based on DASG Spokas's gestures under the totality of the circumstances; therefore, this did not amount to a seizure. (Govt.'s Resp. at 2-4.)

       "As a general matter, law enforcement officers do not effectuate a detention or seizure merely by approaching individuals on the street or in other public places and putting questions to

them." *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002)) (internal quotation marks omitted); *see also Bostick*, 501 U.S. at 434 ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."). The Supreme Court regularly iterates that "police questioning, by itself, is unlikely to result in a Fourth Amendment violation." *Delgado*, 466 U.S. at 216 (discussing decisions). "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [and] ask to examine the individual's identification." *Bostick*, 501 U.S. at 434-35 (citing *Delgado*, 466 U.S. at 216; *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984); *Florida v. Royer*, 460 U.S. 491, 501 (1983); *Mendenhall*, 446 U.S. at 557-58). And, "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." *Delgado*, 466 U.S. at 216; *accord Bostick*, 501 U.S. at 439.

A police-citizen encounter rises to the level of a seizure "only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen," *Jones*, 678 F.3d at 299 (quoting *Terry*, 392 U.S. at 19 n.16) (internal quotation marks omitted), by "terminating or restraining his freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). It is worth noting that this objective, "'reasonable person' test presupposes an *innocent* person." *Bostick*, 501 U.S. at 438 (citing *Royer*, 460 U.S. at 519 n.4 (Blackmun, J. dissenting); *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988)). Indeed, both the

defendant and officer's subjective mindsets are "irrelevant to the Fourth Amendment analysis." *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996) (citing *Whren v. United States*, 517 U.S. 806, 811-813 (1996)) (additional citations omitted).

An unheeded show of authority, standing alone, is insufficient to escalate an encounter into a seizure. In *California v. Hodari D.*, the Court made clear that "a seizure 'requires *either* physical force . . . or*, where that is absent, *submission* to the assertion of authority.'" *United States v. Smith,* 575 F.3d 308, 313 (3d Cir. 2009) (quoting *Hodari D.*, 499 U.S. at 626). Whether Defendant submitted to a show of authority or consented to interact with police is analyzed under *Mendenhall*'s objective, totality of the circumstances test. *Id.* at 313 (citing *Brendlin*, 551 U.S. at 255). Under *Mendenhall*, courts consider a non-exhaustive list of factors to determine whether a seizure occurred:

> These include, but are not limited to, the number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement, whether the officers' questioning was nonthreatening, and whether they treated the defendant as though they suspected him of "illegal activity rather than treating the encounter as 'routine' in nature."

*Jones*, 678 F.3d at 299-300 (quoting *Gray*, 883 F.2d at 322-23). Other pertinent considerations include "the time, place, and purpose of the encounter." *Weaver*, 282 F.3d at 312.

Applying these factors to the initial encounter between Defendant and DASG Spokas, the Court finds that a reasonable person in Defendant's position would not have felt that he lacked the freedom to leave due to DASG Spokas's wave (or waves) of his hand. As an initial matter, the Court notes that DASG Spokas is not a military or civilian police officer, but rather a civilian security guard employed by the Department of the Army whose duties include "enforce[ing] the security regulations of the installation." (Tr. at 4.) His investigative and enforcement authority is limited to Army security regulations and does not extend to enforcing criminal or traffic laws.

(Tr. at 4, 12-14.) When he observes suspicious behavior, his only recourse is to call the police to report the situation so that they may investigate it unless the situation is "something simple" related to his duties that he can resolve himself without leaving his guard post. (Tr. at 12, 14-15.) However, for the purposes of applying the first factor listed in *Jones*, the Court considers DASG Spokas to be an "officer."[4] The parties agree that DASG Spokas was the only officer present during the relevant portion of the encounter. (Govt.'s Resp. at 3; Def.'s Reply at 2.)[5]

At the time that he waved at Defendant, DASG Spokas was in uniform and was wearing his firearm. (Tr. at 23.) That law enforcement officers generally wear uniforms and are armed is a well-known fact. *Drayton*, 536 U.S. at 204-05. "The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." *Id.* at 205. Though these factors are relevant, they are hardly determinative in this case. DASG Spokas did not and could not have touched Defendant at the time that he waved, as they were separated by nearly 100 feet. Nor did DASG Spokas touch Defendant at any point during their ensuing encounter. (Tr. at 19.) Thus, the first four factors, taken together, weigh against finding a seizure and towards finding the encounter consensual.

The next factor is similarly unavailing for Defendant — not only did DASG Spokas not attempt to block Defendant's departure or restrain his movement by waving, a reasonable person likely would have understood his gesture to encourage the exact opposite result. Indeed, it is

---

[4]     The Government does not challenge whether DASG Spokas constitutes a law enforcement officer for purposes of the Fourth Amendment. Accordingly, the Court refrains from opining on that issue.

[5]     During the hearing, DASG Spokas testified that at the time of the encounter, there was another security guard on duty at the security hut with him and that there were no police officers present. (Tr. at 18.) Based on DASG Spokas's hearing testimony, there is no basis to conclude that the other security guard on duty was present at the encounter in any meaningful sense for purposes of this analysis.

conceptually difficult to imagine how a hand wave encouraging someone to approach could be understood to block a person's departure from their current location or restrain their movement. Consequently, any argument that a reasonable person would have understood DASG Spokas's wave to supplant Defendant's autonomy and freedom of movement lacks any credulity considering where DASG Spokas stood relative to Defendant's car at the time of the wave.

Most of the remaining factors require little discussion. Because DASG Spokas did not speak to Defendant until after the wave and after Defendant pulled up to the checkpoint, there is no questioning for the Court to consider for signs of coercion in its analysis of the waving. Its absence, while not determinative, is nonetheless informative. In similar cases, other courts have considered this as part of the totality of the circumstances analysis. *See, e.g.*, *United States v. Laboy*, 979 F.2d 795, 799 (10th Cir. 1992) ("There is no claim [the detective] used an intimidating tone of voice or language to compel [defendant] to cross the street. In fact, the detective's verbal communication with [defendant] began only after [defendant] had crossed the street."). The Court notes that in this Circuit, "it is not enough to establish a seizure that the person asking the questions was a law enforcement official." *Gray*, 883 F.2d at 323 (citing *Terry*, 392 U.S. at 31-33 (Harlan, J. concurring)) (internal quotation marks omitted). In the absence of police questioning as part of the alleged seizure, it appears reasonable to extrapolate the logic of *Gray* to this case, where Defendant offers little to support his seizure claim beyond the mere fact that the person waving his hand was a law enforcement official. (Def.'s Reply at 2).

Similarly, because DASG Spokas waved Defendant forward so soon after Defendant pulled onto the shoulder and did not in any other way communicate with Defendant until after Defendant pulled forward, there is nothing in the record from which to conclude that DASG

14

Spokas's behavior — consisting solely of waving at Defendant — objectively indicated that the purpose of the stop was investigatory and suspicion-based rather than routine. Though DASG Spokas testified that he subjectively viewed Defendant's car as suspicious, his subjective intentions are irrelevant to the Court's objective inquiry. *Sanchez*, 89 F.3d at 718 (citing *Whren*, 517 U.S. at 811-813). Nothing about DASG Spokas's wave would signal to an ordinary person 100 feet away that the officer was targeting him as suspicious rather than merely directing traffic.

The final two factors — the time and place of the encounter — also militate against finding that DASG Spokas's gesture was objectively coercive. This encounter occurred around 1:00 p.m., in broad daylight and in full view of anyone in the area. (Tr. at 30.) Defendant argues that because this entire encounter took place at an entrance to Fort Lee, the military surroundings heightened the coerciveness of the situation. (Def.'s Reply at 2.) Though it is true that the military is a powerful symbol of governmental authority, nothing in the facts presented before this Court suggests that a reasonable person would find that this fact, without more, would transform an otherwise neutral gesture into a coercive show of authority. Defendant's contention about the inherent coerciveness of the military location is further undermined by the fact that Defendant surely did not find himself at the threshold of a military installation inadvertently. A reasonable person in Defendant's position would have seen Temple Gate before turning from Temple Avenue onto Edgewood Road and would have immediately realized that they were looking at a permanent checkpoint as evidenced by the metal gate, brick columns and signage. (Tr. at 28-32, 36-38).

Also pertinent to the analysis of the location factor is DASG Spokas's testimony that based on the direction that Defendant's car faced and its positioning while on the shoulder, the only direction in which Defendant could have lawfully traveled from his position on the right

15

shoulder of Edgewood Road's southbound lane was straight ahead towards the checkpoint. DASG Spokas waved Defendant in that direction. Defendant asserts that the fact that DASG Spokas failed to provide Defendant with "an alternative option, such as moving along" added to the coerciveness of the situation; however, based on the record, Defendant's contention lacks merit. (Def.'s Mot. to Suppress Evidence at 3.) DASG Spokas waved Defendant in the only direction in which Defendant could safely re-enter traffic from his position on the right shoulder — forward in the southbound lane. (Tr. at 9, 11, 13-15, 20.) DASG Spokas testified that even when drivers who approach the Gate do not want to enter Fort Lee and seek only to turn around and exit towards Temple Avenue, they have no choice but to go through the checkpoint to make a U-turn. (Tr. at 19.) Defendant cannot claim that he was overwhelmed by the coerciveness of the military backdrop when he voluntarily drove his car to a highly visible entrance gate of an Army post to pick up someone who worked there. (Tr. at 16.)

Defendant points to two Fourth Circuit cases in support of his argument that a hand gesture alone may establish a seizure, but the facts of both cases are distinguished from those in the matter at bar. (Def.'s Reply at 2.) In *Santos v. Frederick County Board of Commissioners*, two uniformed and armed deputy sheriffs approached the plaintiff, an illegal immigrant who spoke little English, while she sat on a curb outside of her workplace and began questioning her. 725 F.3d at 457. After finding that "the encounter was consensual at its inception," the court went on to hold that one of the deputies seized the plaintiff when, in response to her asking if there was a problem, he said "no, no, no" and gestured for her to remain seated, and she complied. *Id.* at 458, 462 ("Openshaw's gesture 'unambiguous[ly]' directed Santos to remain seated."). The critical distinction between *Santos* and the instant case is that the deputy in *Santos* made the gesture only after the defendant signaled her uneasiness after several minutes of

16

observing the deputies' clearly escalating investigative activities once she provided her El Salvadoran identification card to them. Here, in contrast, DASG Spokas waved to Defendant almost immediately upon observing Defendant's odd positioning on the shoulder, before any other communication took place. A reasonable person would have likely interpreted the defendant's decision in *Santos* to remain seated as submission to the deputy's expressed desire that she do so, but a reasonable person would be hard-pressed to find any basis for reaching a similar conclusion in this case, where in view of the surrounding circumstances as described above, Defendant merely resumed driving in the direction of the flow of traffic.

Defendant also references the Fourth Circuit's decision in *United States v. Robertson*, 736 F.3d 677 (4th Cir. 2013), and asserts that the court held that the officer's act of waving the defendant forward constituted a seizure. (Def.'s Reply at 2.) Defendant misapprehends *Robertson*'s holding. The Fourth Circuit found that the defendant was seized not by virtue of the officer's hand motion, but rather in light of the overwhelmingly coercive nature of the surrounding circumstances indicating that the defendant was not at liberty to leave. *See Robertson*, 736 F.3d at 680-81 (describing the police-dominated atmosphere and the officer's accusatory question and tone of voice as indicative of a seizure under the totality of the circumstances).

The Tenth Circuit's decision in *United States v. Laboy*, 979 F.2d 795 (10th Cir. 1992), more closely parallels the facts in the current case than *Santos* or *Robertson*.[6] In that case, while walking, the defendant observed an undercover police officer on the other side of the street who waved him over after they made eye contact. *Id.* at 797. The defendant crossed the street and approached the officer, who then asked the defendant if he had drugs to sell. *Id.* at 797-98. The

---

[6]    Though Tenth Circuit precedent is not controlling authority in this case, the Court finds the Tenth Circuit's *Laboy* analysis persuasive.

defendant responded affirmatively, at which point the officer arrested him. *Id.* at 798. The defendant "testified that he knew that he was watching an arrest in progress, and he interpreted [the officer's] gestures to him as a sign that he was being arrested, and felt that he might be shot if he tried to run away." *Id.* The defendant stated that at the time the officer affected this alleged seizure by gesturing to him to cross the street, the officer was more than 25 yards away from him. *Id.* The Tenth Circuit found that the officer's actions did not constitute a show of authority sufficient to lead a reasonable person to believe that they were not free to leave, thereby rejecting the defendant's argument that a seizure occurred under the Fourth Amendment. *Id.* at 799.

The facts here track those in *Laboy*, including the fact that only one police officer was involved, the officer did not physically touch the defendant and was a substantial distance away from him at the time of the wave, there was no basis for claiming that the officer's tone of voice or language was coercive because he did not speak to defendant until after the alleged seizure and the encounter occurred in plain view on a public street. *Id.* at 799. The gesture at issue was essentially the same sort of hand wave as made by DASG Spokas, which the court found was not inherently coercive. As the Tenth Circuit observed: "[M]erely motioning a person to approach a police officer, unaccompanied by verbal communication or show of force, is not inherently coercive." *Id.*

Based on its analysis of the totality of the circumstances here, the Court finds that a reasonable person in Defendant's position would not have understood DASG Spokas's hand waving to restrict or terminate their freedom of movement, thereby resulting in a seizure under the Fourth Amendment. In addition, the Court finds that even if DASG Spokas's hand wave was a show of authority, based on the totality of the circumstances, a reasonable person would not have felt coerced into submission based on the factors described above. "While most citizens

will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Delgado*, 466 U.S. at 216.  Indeed, Defendant did not objectively manifest any indication that he was not acting voluntarily, or that he was merely acquiescing to a show of authority.  The fact that he stopped short of the checkpoint when he first turned onto Edgewood Road is a relevant consideration, but after the alleged show of authority at issue, Defendant did not signal that his cooperation was anything but voluntary.  Defendant did not drive away, refuse to move, call out or otherwise signal to DASG Spokas that he preferred to remain where he was.  In the absence of any evidence to the contrary, a reasonable person would likely conclude that under the totality of the circumstances, Defendant was not seized as a result of DASG Spokas's wave.

C.  Defendant Was Constitutionally Seized When He Reached the Checkpoint.

Defendant asserts that because he only approached the checkpoint after being seized, the seizure remained unconstitutional once he reached the checkpoint.  (Def.'s Reply at 5.)  In addition, Defendant argues that even if DASG Spokas possessed adequate justification for briefly seizing him, the checkpoint stop's scope and duration were unreasonable.  (Def.'s Reply at 5-7.)  The Government contends that the checkpoint stop was reasonable under the totality of the circumstances.  (Govt.'s Resp. at 4-7.)

An individual stopped at a checkpoint, like one briefly detained in a routine traffic stop, is seized for purposes of the Fourth Amendment.  *See Brendlin*, 551 U.S. at 255 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979) ("The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver even though the purpose of the stop is limited and the resulting detention quite brief.")) (internal quotation marks omitted); *United States v. Charrington*, 285 F. Supp. 2d 1063 (S.D. Ohio 2003) (citing *City of Indianapolis v. Edmond*, 531

U.S. 32, 40 (2000); *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990)) ("The stopping of an individual at a law enforcement checkpoint constitutes a 'seizure' within the meaning of the Fourth Amendment."). On restricted access military installations that are not completely open to the public, guards briefly stop traffic at entry checkpoints to ascertain the identity of a car's occupants and will often perform a search of the vehicle. *See United States v. Jenkins*, 986 F.2d 76 (4th Cir. 1993) (discussing military checkpoints). These brief seizures and searches "have long been exempt from the usual Fourth Amendment requirement of probable cause" and particularized suspicion, and are deemed reasonable because of the Government's national security and safety interests in protecting its military installations, personnel and property. *Id.* at 78 (citing *United States v. Ellis*, 547 F.3d 863, 866-67 (5th Cir. 1977); *United States v. Rogers*, 549 F.2d 490, 493-94 (8th Cir. 1976); *United States v. Vaughan*, 475 F.2d 1262, 1264 (10th Cir. 1973)).

Once Defendant approached DASG Spokas at the checkpoint, he initiated a consensual encounter that renders consideration of whether he was "seized" unnecessary. *See United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005) (holding that even if driver's encounter with armed CIA guards was a seizure, it was consensual and therefore reasonable where the driver voluntarily approached CIA headquarters in the middle of the night to ask for directions, was instructed to pull forward from call box to barrier 75 meters further onto CIA property, and did so). An individual's consent to the seizure and potential search attendant to seeking entry to a military installation is implied by the totality of the circumstances. *Jenkins*, 986 F.2d at 79 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Indeed, in *United States v. Smith*, the Fourth Circuit rejected appellant's argument that even if he approached the checkpoint voluntarily, his consent did not extend to the "customary security precautions" including

questioning by armed guards regarding his intentions.  395 F.3d at 519-20 ("We do not believe the scope of his consent can be viewed so narrowly. . . . In fact, the Fourth Amendment does not even require that the suspect *actually* consent to a government search; factual determinations by the government, such as the presence of consent, must be *reasonable*, but are not required always to be *correct*.").  As the Fourth Circuit explained in *United States v. Jenkins*, "[t]he barbed-wire fence, the security guards at the gate, the sign warning of the possibility of search, and a civilian's common sense awareness of the nature of a military base — all these circumstances combine to puncture any reasonable expectation of privacy for a civilian who enters a closed military base." 986 F.2d at 79.

Defendant entered Fort Lee jurisdiction when he turned onto Edgewood Road and approached the fence line at the Temple Gate to pick up a friend. (Tr. at 9, 22.)  In doing so, he passed a sign that notified drivers approaching the Gate of the entry requirements, including the identification check policy. (Tr. at 37.)  After briefly pulling onto the shoulder of the gate road, Defendant approached the checkpoint and initiated a consensual encounter with DASG Spokas. At no point during the lifespan of this encounter did Defendant in any way indicate to DASG Spokas that he wished to terminate the interaction and depart, or that he did not wish to enter the installation. (Tr. at 16-17, 19, 36.)  Thus, under the controlling precedent in this Circuit, his consent to the stop at the checkpoint and the subsequent identification check carried out by DASG Spokas was implied by the totality of the circumstances, was consensual and was therefore reasonable. *See Smith*, 395 F.3d at 519-20; *Jenkins*, 986 F.2d at 79.

Furthermore, Defendant's checkpoint encounter with DASG Spokas was appropriately limited in scope and duration to the routine checkpoint procedure at the Temple Gate. (Tr. at 4, 16-19, 23-24.)  DASG Spokas asked Defendant three questions, all of which were in furtherance

of his duty to enforce the applicable security regulations and to verify the identity of all individuals who present themselves at the Gate. (Tr. at 4, 16-19, 23-24.) DASG Spokas relayed Defendant's biographical information to the military police office as he is required to do every time an individual at the Gate lacks an identification card. (Tr. at 17, 19-20.) The military police used this information to verify Defendant's identity by searching for him in the VCIN system and discovered that Defendant's license was suspended. (Tr. at 17-18.) The military police dispatched an officer to the Temple Gate to issue Defendant a citation. (Tr. at 17-19.) The Court concludes that it was only at this point that the checkpoint stop exceeded the duration of a routine stop that does not result in a traffic citation and ripened into a true seizure. This additional period of detention was entirely reasonable, however, because it was based on the military police officer's probable cause to believe that Defendant was driving on a suspended license. (Tr. at 17.) Thus, the Court finds that Defendant's encounter with DASG Spokas was constitutional from its inception through its conclusion. Accordingly, the Court DENIES Defendant's Motion to Suppress Evidence.[7]

---

[7]      Because the Court finds no constitutional violation involving Defendant's encounter with DASG Spokas, the Court need not address the challenging issue of whether identity-related evidence may be subject to suppression under the Supreme Court's holding in *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984). *See United States v. Oscar-Torres*, 507 F.3d 224, 228 (4th Cir. 2007) ("The meaning of the *Lopez-Mendoza* 'identity statement' has bedeviled and divided our sister circuits.")

III.    CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress Evidence (ECF No. 6) is

DENIED.  An appropriate Order shall be issued consistent with this Opinion.

Let the Clerk file this Opinion electronically and notify all counsel accordingly.


_____/s/_____
David J. Novak
United States Magistrate Judge


Richmond, Virginia
Dated: October 14, 2014